## CHARLESTON

SOUTH PENN OIL CO. v SNODGRASS et als.

Submitted December 10, 1911.    Decided December 10, 1912.

1.    MINES AND MINERALS—*Oil and Gas Lease—Mutuality of Obligation.*

An oil and gas lease for the term of ten years and as much longer as oil or gas shall be produced from the demised premises, reciting a consideration of one dollar and imposing conditions for non-performance of which forfeiture is imposed, but containing no covenant to drill a well or pay any money for failure to do so, creates a conditional tenancy, binding upon the lessor until expiration in accordance with the terms of the lease, provided the stipulated conditions are performed, and is not devoid of mutuality of obligation.    (p. 439).

2.    SAME—*Oil and Gas Lease—Construction—Joint Lease.*

An oil and gas lease, executed by three several owners of contiguous lands, embracing their said lands, describing the demised premises as a single tract, contemplating a single well as a condition to its continuance, providing for payment of delay or commutation money to them jointly, and otherwise treating them as tenants in common, is, as between the lessors and the lessee, a joint lease of a single tract of land.    (p. 440).

3.    SAME—*Oil and Gas Lease.*

Under an oil and gas lease for a term of ten years "and as long thereafter as oil or gas or either of them is produced" from the demised premises, the discovery of oil by the drilling of a well within the specific term of ten years, and production of oil therefrom, though in unremunerative quantity, and faithful, diligent and skillful effort to make the well produce in paying quantities, and otherwise develop the property, continues the lease in force after the expiration of said term. (p. 442).

(WILLIAMS, JUDGE, absent).

Appeal from Circuit Court, Roane County.

Suit by the South Penn Oil Company against C. A. Snodgrass and others.    Decree for complainant, and defendant White Rock Oil Company appeals.

*Thos. P. Ryan* and *Holt & Duncan,* for appellant.

*A. B. Fleming, Chas. Powell, Kemble White* and *E. A. Brannon* for appellee.

*Affirmed.*

POFFENBARGER, JUDGE:

In this contest for supremacy between a senior and junior lessee of the same property, brought into the realm of the judiciary by a bill to cancel the later leases as clouds upon title of the former, and an injunction to protect the lessee in possession under the senior lease from molestation and injury at the hands of the junior lessee and lessors, their agents, servants and employes, one ground of attack upon the senior lease is alleged lack of mutuality and inadequacy of consideration.

It recites a consideration of one dollar paid and the covenants and agreements therein contained to be kept and performed by the lessee. These are to deliver to the credit of the lessors or their assigns free of cost in the pipe lines to which the lessee's wells should be attached the usual royalty of one-eighth of the oil; to pay one hundred dollars per year for each paying gas well that should be drilled and operated; and to locate all wells so as to interfere as little as possible with the cultivated portions of the farm. No covenant to drill any well or pay any money in default of drilling was inserted; but this proviso was put in: "This lease shall remain null and void and all rights hereunder shall cease and determine unless a well shall be completed on the said premises within one year from the date hereof or unless the lessee shall pay at the rate of ($60.00) Sixty Dollars quarterly in advance for each additional three months such completion is delayed from the time above mentioned for the completion of such well until a well shall be and operate as a full liquidation of all rental under this provision during the remainder of the term of this lease." In connection with these provisions, showing slight consideration, a surrender clause in the following terms is relied upon as proving lack of mutuality: "It is agreed that the second party * * * shall have the right at any time to surrender this lease to first parties for cancellation, after which all payments and liabilities to accrue under and by virtue of its terms shall cease and determine and this lease become absolutely Null & Void." The term was for ten years, commencing Dec. 14, 1899. No well was commenced until within the last quarter of the last year of the ten year period, but the delay or commutation money was paid for

every quarter except the last one and there was a tender of it for that quarter.

Though it contains no covenant to drill or pay rent and allows the lessee the privilege of surrender at any time, the validity of this lease and its binding force upon the lessor, as one creating a conditional tenancy for the specified term of ten years, are put beyond all question by several decisions of this Court, distinguishing leases of its class and character from those considered in *Eclipse Oil Co.* v. *South Penn Oil Co.*, 47 W. Va. 84, and *Trees* v. *Eclipse Oil Co.*, 47 W. Va. 107. Re-statement of the principles and reasoning of the decisions declaring the recited consideration of one dollar sufficient and adequate for a conditional term, to be kept alive only by the drilling of wells or periodical payment of money, would be a work of supererogation and a waste of time. It amply suffices to cite the following cases: *Smith* v. *Root,* 66 W. Va. 633; *Pyle* v. *Henderson,* 65 W. Va. 39; *Friend* v. *Mallory,* 52 W. Va. 53; *Guffy* v. *Lowther,* 52 W. Va. 88. A very clear and able exposition of the same principles will be found in the opinion of Judge Van Devanter in *Brewster* v. *Lanyon,* 140 Fed. Rep. 801.

Whether the lease created a tenancy of a single tract of 600 acres, composed of three smaller tracts, or separate tenancies of three constituent tracts, is a subject of lengthy discussion in the briefs, based upon the erroneous view of the lease just disposed of. C. A. Snodgrass, M. J. Snodgrass, his wife, and O. W. Snodgrass, owning, respectively, the three contiguous tracts of 329 acres, 143 acres and 127.5 acres, executed a single lease covering all of them and describing the premises as a single tract of 600 acres more or less. Later, O. W. Snodgrass conveyed his portion thereof to M. J. and J. O. Elmore, and C. A. Snodgrass 114.5 acres of his portion to Daniel D. Snodgrass. Notwithstanding the description of the land as a single tract, the commutation or delay money was paid by the lessee to the several owners in amounts corresponding to their respective portions of the land. The rentals having been paid to September 14, 1909, leaving only one more quarter of the term, all of the lessors except Daniel D. Snodgrass, attempted to terminate the lease by declining to receive the rental. Thereupon the lessee paid their portions of the rental into the Bank of Spencer, to

their credit, under a provision of the lease authorizing such payment. Assuming invalidity of the lease for lack of mutuality of obligation, making the tenancy one at the will of the lessors, the appellant, owning a subsequent lease of some of the land, two tracts containing, respectively, 143 acres and 214 acres, contends the refusal of the rentals and execution of new leases put an end to the tenancy of the South Penn Oil Co. as to those portions of the land for which the rentals were refused, leaving it in existence, if at all, as to the portion for which rentals were received or subsequently accepted after payment into bank. While the Elmores declined to receive their share when tendered, they afterwards withdrew it from the bank. The lease created a conditional term of ten years, binding the lessors to accept the rentals, provided they were tendered in time, and non-forfeitable within that period, except for non-compliance with conditions. As none of the lessors could forfeit it by mere refusal to receive rental, tendered in time, and execution of new leases, there would have been no forfeiture if all the lessors had declined to receive the money, admittedly tendered or paid into bank within the prescribed time. Hence, it is clear that such refusal of some of them did not work a forfeiture, and that no inquiry as to whether the lease created a tenancy in the single tract of 600 acres or three separate tenancies in smaller tracts arises in this connection.

Failure to drill wells on two of the tracts, namely, the 134 acre tract and the C. A. Snodgrass tract, within the ten year period, however, necessitates an inquiry as to whether there were three separate leases within the meaning of the proviso, requiring a well to be drilled, and the clause extending the lease beyond the specific term of ten years. We think not. Nowhere in the lease is there an intimation of several ownerships of parts of it, or a suggestion of intent to make separate tenancies. The proviso is for "a well," not wells, "on the said premises," or payment of a lump sum of money quarterly as rental, and for liquidation of all rental by "the completion of such well." The clause providing for extension of the lease beyond the ten year term requires only production of oil or gas thereafter, without any stipulation for production from more than one place or any particular place. Being general, production from any place on

the premises would comply with its terms.  We perceive no legal obstacle to a combination of several tracts of land, owned by different persons, into a lease as a single tract, since the lessors can apportion the rental among themselves in amounts corresponding with their interests, and we have decided that it can be done.  *Harness* v. *Eastern Oil Co.*, 49 W. Va. 232. Though payment of the rental to the lessors jointly was adverted to in that case as conduct in harmony with the conclusion reached, the language of the opinion indicates that it was not regarded as a determining factor.  Apportionment of the rental by the lessee, in this instance, was no doubt a mere courtesy to the lessors.  The lease, clear and unambiguous, imposed no such duty, and the interpretation of such an instrument is not governed or varied by mere conduct inconsistent with its terms.

The vital question in the case is whether the lease of the South Penn Oil Co. had expired before this suit was instituted. This involves a subsidiary one of fact, namely, whether any oil was discovered by the lessee within the life-time of the lease, and another of law, namely, whether mere discovery of oil within the term created by the lease, without production thereof, or in quantity too slight for profitable production, suffices to extend the term beyond the specified period of ten years under the phrase, "as long thereafter as oil or gas or either of them is and assigns." Upon the question of fact the evidence is conflicting and we may consistently refuse to disturb the finding of the court below as to it.  It is conceded, however, that the evidence does not show anything more than mere discovery of oil within the period of ten years and production of traces thereof. That period expired on the 14th day of December, 1909.  The discovery was made on the 8th day of December, 1909.  The well was shot on the 14th day of December, 1909, the last day of the term.  About the 22nd or 23rd of that month, the lessee began to pump the well and continued to do so, night and day, for two and a half months, and thereafter once a week for a considerable period of time.  All of this effort resulted in the accumulation of not more than one barrel of oil, and there is a denial, not wholly unsupported by evidence, that this came from that well.  Confessedly, therefore, oil was not produced from

the well in paying quantities at any time within the said period of ten years. Nor had there been such production at the dates of execution of the subsequent leases. Two of these, one from M. J. Snodgrass, 143 acres, and the other from C. A. Snodgrass and wife, embracing 214 acres, were dated Dec. 18, 1909. The Sherwood Oil and Gas Company, lessee in each of them, assigned the first one to H. L. Van Sickler, Jan. 10, 1910, and the other to R. B. Holt, Jan. 15, 1910. New leases of the same land were executed to Holt by C. A. and M. J. Snodgrass, Jan. 18, 1910, and on Jan. 22, 1910, Holt and wife assigned all his interest in the land to White Rock Oil Company, the appellant. Nor was there such production when this suit was commenced, Sept. 21, 1910.

Before proceeding to disposition of the vital question already indicated, it is fair to say, upon consideration of the following facts, the equity of the case is with the plaintiff. Before it began to drill, it paid the lessors about two thousand dollars in rentals. It sank a well to a depth of 2038 feet within the term, the cost of which, together with that of equipping and operating the well afterward, was more than seven thousand dollars. A second well was located on the leased premises, on the day of the execution of the first subsequent lease thereof, to-wit: December 18, 1909. A well on an adjacent tract of land, known as the Looney tract, drilled by the plaintiff, had shown the presence of oil in paying quantities, the production of that well being about forty barrels per day. This second well on the Snodgrass land was located as an offset to the well on the Looney land. In the midst of this diligent and costly effort to make the lease yield profit, the defendants, part of the lessors and their subsequent remote lessee, the White Rock Oil Co., attempted to oust the senior lessee. Of course subsequent production under the senior lessee would profit the junior lessee nothing. It would be to its detriment in the practical sense of the term, for it would derive no benefit therefrom; but such production by the senior lessee would inure to the benefit of the lessors in the junior leases, since the stipulated royalty would be run into the pipe lines to their credit, and the object of the original lease thereby accomplished. However, if the senior lease, tested by legal rules, had expired, such an equity cannot be permitted to control. The

legal construction of a contract governs and binds courts of equity as much as courts of law.

In a number of cases, decided by this Court, involving inquiries as to loss of oil and gas leases by abandonment, we have had occasion to say mere discovery of oil or gas in the leased premises, vests in the lessee a limited or qualified estate, the right to make further exploration and to develop, produce and take away the mineral so discovered. *Crawford* v. *Ritchey*, 43 W. Va. 252; *Parish Fork Co.* v. *Bridgewater Co.*, 51 W. Va. 583; *Lowther Oil Co.* v. *Oil Co.*, 53 W. Va. 501; *Steelsmith* v. *Gartlan*, 45 W. Va. 27; *Henne* v. *South Penn Oil Co.*, 52 W. Va. 192. The rights of the parties in all these cases were tested and determined by principles applicable during the continuation of the stipulated term, not after the expiration thereof. Such was the case of *Parish Fork Co.* v. *Bridgewater Co.*, in which mere discovery of oil was held sufficient to vest an estate, and in which we animadverted upon the importance of considering, in the interpretation of oil and gas leases, the purpose and design of the parties thereto, giving rise to implied covenants or obligations. Such was also the case of *Steelsmith* v. *Gartlan.* in which the drilling of a well, disclosing no oil whatever, was held not to vest any estate. Such was also the case of *Lowther Oil Co.* v. *Oil Co.*, in which part of the observations made in the case just alluded to, were repeated and it was added that determination of the question, whether oil discovered is sufficient in quantity to pay, is left to the judgment of the lessee. As I have said, these were all abandonment cases and arose within the limits of the specific term created and defined by the lease. These expressions must be taken for the purposes of that class of cases, and cannot be extended to cases arising after the expiration of that term, if the extension clause, tested by the application of legal principles and rules of interpretation, does not sustain the rights and interests predicated of the lessee within the term.

We have another class of cases involving controversies arising after the expiration of the fixed term. *Ammons* v. *Toothman*, 59 W. Va. 165; *Sult* v. *Hochstetler*, 63 W. Va. 317; *Eastern Oil Co.* v. *Coulehan*, 65 W. Va. 531; *McGraw Oil Co.* v. *Kennedy*, 65 W. Va. 595, in which some of the observations made in the

other class of cases are used by way of argument, but such repetitions in those cases must be taken in connection with the facts, so as to enable us to see how far the principles they declare entered into the decisions. In the *Ammons* v. *Toothman* case, a producing well had been drilled within the specific term. After the expiration of that term that well ceased to produce. Then the lessee diligently set to work to sink the well still deeper into another producing sand. There was an actual cessation of production, but no abandonment on the part of the lessee. At heavy cost, the lessee proceeded to restore production. Its right to produce oil from the lower stratum, however, was not litigated. The controversy arose between the land owners. There was a clear case of abandonment in *Sult* v. *Hochstetter*, so that the present inquiry was not involved. In *Eastern Oil Co.* v. *Coulehan,* the term expired without actual production, although gas in paying quantities had been discovered. Instead of producing and marketing the gas first found, the lessee proceeded to drill deeper in the hope of finding oil or a larger quantity of gas. Its work was delayed by an attempt on the part of the lessor, to prevent completion of the well within the term and so bring about a forfeiture. Upon these facts, two questions arose, the first of which was whether the gas first discovered vested an estate in the lessee, which had not been lost by abandonment or otherwise, and the second, whether the completion of the well, resulting in discovery of additional gas in lower sand, about twelve hours after the expiration of the term, without actual production thereof at any time within the term, or so as to yield any benefit or profit by way of actual payment, or tender thereof, to the lessor within the twelve hours after the expiration of the term, was a compliance with the clause extending the term, by production of oil or gas or payment of rental on the lease. On the first question, Judge Miller applied the principles announced in cases involving controversies arising during the term and concluded as follows: "We would have to say on the weight of the evidence that gas was found by plaintiff in the first sand, in sufficient quantities to vest in it the right to produce oil or gas from said land, and that there was no intention to abandon that right by going deeper with the same well to the lower rock." He did not rest the decision, however,

solely upon that ground, but proceeded to ascertain and declare that there had been a substantial compliance with the contract on the part of the lessee. Further discussing this phase of the case, he said: "There can certainly be no question as to the fact that the plaintiff substantially performed its contract. It had discovered gas in one sand and was about to 'find it in a lower sand in still greater quantities, and we cannot say from the evidence that but for the improper interference by the defendant with its operation it would not have discovered the gas in the lower sand within the term of five years." Thus the title or estate of the lessee seems to have been upheld without any actual production and marketing of gas, after the term had expired. *McGraw Oil Co.* v. *Kennedy* involved an entirely different question. A well, deemed by the lessee to be productive in paying quantities, had been drilled upon the leased premises within the term and tubed and the gas shut up in it by way of storage and the annual rentals stipulated for in the lease as to gas wells promptly paid. As the lessor had no interest in the question of profit to the lessee, and was obtaining his rent just as if the gas had been actually produced and sold, the court upheld the title of the lessee.

*Eastern Oil Co.* v. *Coulehan* seems to sustain the contention of the senior lessee, unless we say the gas or oil discovered must be shown to exist in paying quantities and to be capable of production in an amount profitable to both lessor and lessee, especially the former. In the *Coulehan Case,* the extension clause said nothing about the quantity of production, nor does the lease involved here. Both required production to keep the leases alive after ten years. In the *McGraw Oil Co.* v. *Kennedy* case, the lease was to continue after the specified term, so long as oil or gas should be produced therefrom. In discussing this clause, Judge Brannon said: "So, this lease contains nothing in terms allowing the lessor to end it because oil or gas is not found in paying quantity; and if there were such provision, I should regard it as made in the interest of the lessee to protect him from payment of the annual sum for a gas well, if insufficient in quantity, and not as intended to give the lessor right to terminate the lease against the lessee's will, he treating the quantity as sufficient and electing to pay. What right has Evans

to say that no estate vested by reason of insufficiency of gas, when the lease makes no such provision, and the lessee chooses to regard it as sufficient and pay as if it were? * * * It is useless to argue that a lease does not vest right to oil or gas in place, and therefore no right vests of any character, if the quantity is too small to pay." These observations were made, however, in a case in which the lessor had been receiving all that the lease entitled him to, in case the gas had been marketed in the largest possible quantities. The real object of that suit was to cancel the lease for failure to drill additional wells. The case did not fairly involve the question we are now considering, namely, whether the mere discovery of oil or gas within the term will sustain the claim of right in the lessee to hold possession of the premises and diligently continue his efforts to obtain the mineral after discovery within the term, but actually producing only a trace of oil. Nor did it fairly involve an inquiry as to whether the mineral so discovered must have been ascertained to exist in paying quantities, when the extension clause calls for mere production without qualification as to quantity. Nor was that question necessarily involved in the *Coulehan Case,* for, in that case, gas was disclosed in immense quantities. It may have been in the *Ammons Case,* if it could be regarded as one between lessor and lessee, since the oil originally discovered in paying quantities had been exhausted and the litigation arose over an effort to find gas in paying quantities in a lower stratum. But there had been a cessation of production before it was found and before it was disclosed, by any operation under that lease, that any oil existed in the lower stratum. Whether it arises here is rendered doubtful by expert testimony to the effect that, in many instances, wells yielding large quantities of salt water do not disclose their capacity for oil production until after the exhaustion of the salt water by pumping, which the appellee asserts it has been endeavoring to accomplish by continuous pumping for some months since the oil was discovered, and the opinion of experts that, upon the exhaustion thereof in this well, oil will be obtained in paying quantities.

The words of the contract, respecting the condition upon which the tenancy is to be continued after the expiration of

the term, and those respecting the conditions for keeping it alive within the term, differ. Literally a new condition is agreed upon for time subsequent to the term. The stipulation is, not that the lease shall thereafter remain in force, if oil or gas shall have been discovered and is known to exist in the leased premises, but as long thereafter as oil or gas shall be produced therefrom. It rather implies necessity of antecedent production and continuation thereof. Adhering to the letter of this clause, the following cases, collated by Mr. Archer in his late work on Oil and Gas Cases, at page 487, require strict compliance therewith: *Cassell* v. *Crothers,* 193 Pa. 359; *Murdock-West Co.* v. *Logan,* 69 O. St. 514; *Barnsdall* v. *Boley,* 119 Fed. Rep. 191. In the first of these, the court held as follows: "In an oil lease for a fixed period and 'as long thereafter as oil is found in paying quantities,' where the lessor's compensation is one eighth of the oil produced, the tenancy as to the surface of the land, after the expiration of the fixed period, and after the fact that oil is not being found and produced in paying quantities becomes susceptible of proof, is a tenancy in the nature of a tenancy at will, and if not actually terminated by mutual consent, or continued by mutual consent in order that further exploration be made, may be terminated by either party." In construing the lease, the trial judge stated this conclusion, among others, which the appellate court approved: "The tenancy of the plaintiff in this case, which alone related to the surface of the defendant's land after April 22, 1897, was not in consideration pended upon the continued production of oil in paying quantities: or, stated negatively, upon the exhaustion of the mineral that was being mined. The moment that oil was not being produced in paying quantities, and that fact was ascertained and declared, that moment the right to occupy the surface for oil and gas purposes ceased, regardless of the fact that the termination of the fixed term of the lease was on April 22, 1897." In the second case, the Ohio court held as follows: "The stipulation in the lease that the term shall continue 'as much longer thereafter as oil or gas shall be found in paying quantities,' requires that oil or gas shall be actually discovered and produced in paying quantities within the term." In the opinion, the court said: "In order to continue their lease beyond the

stipulated time it was necessary for the lessees to find oil in paying quantities. For this purpose it was not sufficient to complete a well having some indications of oil, or a well which might be developed into a well producing oil in paying quantities, but the lessees must actually find oil in paying quantities and this is the same as obtaining and producing it in paying quantities." The third case involved a lease for five years and as much longer as oil or gas should be found in paying quantities. A well, producing a small amount of oil had been drilled and pumped at intervals during the last year or two of the term but not yielding enough to pay the expense of pumping. On a bill by the lessee to sustain his claim of right to hold the lease, brought after the expiration of the term, the court held that he had not complied with the implied condition of the lease, requiring him to develop the property in good faith, and refused him relief by way of enforcement of the lease.

The process of reasoning by which this result is reached, however, segregates the clause in question from its context. Nothing is considered but its own words. If other parts of the instrument, read with them, show a clear intent and purpose to restrain or limit them, the rules of construction demand the adoption of the qualified or limited meaning. The clause follows other provisions exactly defining the rights of the parties in some respects and not expressly in others. A term of ten years, forfeitable for non-compliance with carefully worded conditions, is created, but some of the most vital provisions of the instrument are raised by implication only. The relative rights of the parties arising on the completion of a well without finding any mineral are not stated. Nor is anything said as to what shall happen in case of discovery of oil by the completion of a well without actual production. The courts have supplied these omissions by construction, on the theory of necessary implication. Completion of a "dry hole" does not terminate the lease. *Tenne* v. *South Penn Oil Co.,* 52 W. Va. 192; *Aye* v. *Philadelphia Co.,* 193 Pa. St. 451. If thereafter the lessee continues his explorations with diligence, his inchoate right cannot be denied him. Discovery of oil without production vests an estate. *Parish Fork Co.* v. *Bridgewater Co.,* 51 W. Va. 583; *Crawford* v. *Ritchey,* 43 W. Va. 252; *Venture Oil Co.* v. *Fretts,*

152 Pa. St. 451; *Glasgow* v. *Charities Oil Co., Id.* 48. The drill-
ing of a well, finding oil or gas or not finding it, producing or
not producing, gives right to continue exploration or production,
as the case may be, if the term has not expired. Discovery of oil
within the term vests an estate, and terminates the mere right of
exploration. It creates the relation of landlord and tenant until
the end of the fixed term beyond question. The estate so vested
can be brought to an en'd within the term by declaration of for-
feiture after abandonment or a surrender and not otherwise. It
is no longer conditional. *Parish Fork Co.* v. *Bridgewater Co.,*
cited; *Lowther Oil Co.* v. *Miller-Sibley Co.,* 53 W. Va. 501;
*Bartley* v. *Phillips,* 179 Pa. St. 175; *Venture Oil Co.* v. *Fretts,*
cited; *Aye* v. *Philadelphia Co.,* cited. Such in general is the
effect of the lease within the term. The clause, relating to sub-
sequent time, says, in very general and indefinite terms, the
lease shall remain in force so long thereafter as oil or gas is
produced. Narrowing our vision to the word "produced," and
expanding it into "produced in paying quantities," we would be
compelled to say discovery of oil and production of only a trace
thereof does not amount to compliance; but, if we give effect to
the other words of the clause and read it all in connection with
the context, we may be able to say its purpose is to extend the
tenancy created within the term, though it may not yet be
productive of the contemplated royalty; for it is essentially an
extension, not a creative, clause. It does not start a new term
or tenancy. Unless the qualifying clause, "as oil or gas is pro-
duced," alters the nature of the tenancy or estate, it remains
what it was within the term, a right to take out the oil, burdened
with the duty to exercise diligence, skill and good faith in the
discharge thereof. If there is any alteration of the character of
the estate, it arises by implication, for there is no express alter-
ation of it. The main purpose of the lessor is to obtain diligent
and skilful effort to make his mines yield him a profit, after
the fixed term as well as within it. If the lessee, having dis-
covered minerals within the term, or contemporaneously with the
expiration thereof, continues operations with diligence, he there-
by obviously executes the chief purpose of the lease, and would
be clearly within his rights, if within the term. To regard it as
compliance with the prescribed condition after the fixed term

would be entirely consistent with the idea of extension or continuation of the tenancy, which is undoubtedly the major office or function of the clause. May we not, therefore, say the qualifying clause "as oil or gas is produced" really means "as long as the premises are diligently and efficiently operated, provided minerals shall have been discovered within the fixed term?" Which construction harmonizes the more completely and naturally with the manifest purposes of the parties as indicated by the other provisions of the lease, their situation and the surrounding circumstances?

In the interpretation and application of a contract, the spirit and purpose of the instrument as well as its letter must be regarded, and made effective in all directions and as to all parties. This rule is well nigh universal and is often enforced to the extent of restraining within reasonable limits general and indefinite terms, literally importing consequences plainly variant from the true intent and purposes of the parties, ascertained from consideration of the whole instrument, read in the light of their situation and the circumstances surrounding them at the date of its execution. This rule was emphasized in favor of the lessor in *Parish Fork Co.* v. *Bridgewater Co.* and others both prior and subsequent. It is equally applicable in favor of the lessee when the terms and conditions warrant its application. He takes upon himself enormous risks and burdens in consideration of his covenants when he drills a well on the leased premises. It is going too far to say either party, at the time of the execution of the lease, intended general and indefinite terms employed by them to be used as instruments of extreme hardship by the operation of technical rules. The clauses operative within the specific term are uniformly construed and applied so as to work out equitable and just results. A "dry hole" does not end the lease under a clause forfeiting for failure to drill a well within a stipulated time. Mere discovery of mineral vests an estate and, without actual production, gives right to continue operations. Cessation of actual production is excused by adverse conditions and miscarriages which must have been contemplated by the parties, though not specified in the lease. The tests of duty and right are diligence and good faith in almost all cases

when the terms, read in the light of the conditions and circumstances, will permit their observance.

Is the situation here such as may occur under any oil and gas lease, drawn as this one was? If so, both parties must have intended an equitable and just result under the circumstances, if the terms used will permit it, for they must be deemed to have foreseen and contemplated it. It is matter of common knowledge that no man can estimate the exact time within which a well can be completed, and that delays due to accidents, trivial and grave, and other causes beyond the possibility of accurate anticipation will occur. Adherence to the strict letter of the extension clause would make no allowance for any of these, and inflict disastrous losses upon diligent and honest lessees in many instances, a consequence plainly not within the intent of either party. These leases are drawn for all sorts of territory, some known to be rich in minerals, and others not known to contain any, and their terms are varied to allow for such differences. In territory remote from actual and profitable operation, leases are often taken, without reasonable expectation of any immediate advantage to the lessor other than a rental in the form of delay money, and with the expectation of delay in drilling until neighboring lands are shown to contain the minerals, and the consequent establishment of probability of the existence thereof in the leased premises. Such seem to have been the conditions under which this lease was taken, as it was for a long term and imposed no obligation to drill a well. In delaying the work until the last quarter, the lessee acted within the terms of the lease and manifested no lack of diligence. Then it discovered and actually produced oil within the term, and continues to do so in fulfillment of the letter of the contract. The facts do not warrant an inference of bad faith. There was no lack of diligence unless failure to commence and complete the well at an earlier date constitutes it, and we are unable to say it does. In this result the lessors obtain all they contemplated or expected at the date of the execution of the contract. Their property has been drilled and its character as oil territory revealed, and the senior lessee is as capable of making it yield them profit as the appellant. They lose nothing but the

advantage of a better contract, a thing not guaranteed by the lease.

In view of these considerations, we are of the opinion that *Cassell* v. *Crothers,* cited, and *Murdock-West Co.* v. *Logan,* cited, accord too much force and effect to the letter of the contract and do violence to its spirit. They make no allowance for accident or miscalculation as to ability or error of judgment as to conditions, entailing enormous consequences, the parties cannot reasonably be deemed to have intended to impose or assume as hazards. Nor do we think they can be distinguished from this case by reason of the difference in terms. "Produced," "produced in paying quantities" and "found in paying quantities" must mean about the same thing, else substance will be subordinated to shadow or mere technicality.

Seeing no error in the decree, we affirm it.

*Affirmed.*

ROBINSON, JUDGE, *(dissenting)* :

This decision makes the contract between the parties to be other than that which they must have contemplated when the lease was executed. To my mind, the extension of the lease beyond its term of ten years is justified by neither reason nor authority. It is not sound doctrine that an oil lease may be extended beyond its terms by the production of a mere smell of oil, or by the pumping of salt water. In reason, both from the character and purposes of the lease as well as from its terms, the parties thereto can not be said to have meant any such thing.