410 S.E.2d 415

**Emory C. CURREY and Mabel I. Currey, husband and wife, Plaintiffs Below, Appellants,**

**v.**

**TNG, INC. (formerly Techwell Natural Gas, Inc.), et al., Defendants Below, Appellees.**

**No. 20081.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 17, 1991.

Decided Oct. 17, 1991.

David G. Hanlon, Harrisville, for plaintiffs below, appellants.

Larry N. Sullivan, Parkersburg, for defendants below, appellees.

## PER CURIAM:

Emory C. Currey and Mabel I. Currey, husband and wife, sued in the Circuit Court of Ritchie County on May 25, 1989, to void an oil and gas lease in which they were the lessors and North Hills Investment Company was the original lessee. The lease was dated December 14, 1981, and was assigned to TNG, Inc., on July 1, 1986.[1] The lease was in force until July 1, 1982, and "as long thereafter as operations for oil or gas, or either of them, are being conducted on the premises, or oil or gas, or either of them, is being produced in paying quantities." The lease further provided that free gas be furnished to the lessors for domestic use.

A well was drilled on the Curreys' property in 1982 and produced oil and gas until 1986. The lessors received their last royalty check in March of that year. The last time an employee of the lessee came to the well site was in February of 1987. At that time, the employee removed a piece of equipment from the well known as a "rabbit,"[2] which had the effect of shutting the well in.[3] Even though the well had been shut in, TNG did not tender the $300 per year shut-in rental required by the terms of the lease.[4]

After the well was shut in, Mr. Currey placed a by-pass regulator on it, which allowed the continued production of gas for domestic use. Moreover, Mr. Currey diverted the flow of oil from the well to prevent it from seeping into his home's gas lines. He stored the oil in tanks. On two occasions, after the tanks were full, Mr. Currey sold the oil to Main Star Oil Company (Main Star) and directed that the working-interest share be paid to the lessees. The lessees did not, as required by the lease, defray the expense of "producing" this oil.

In May, 1989, the Curreys filed suit requesting that the lease be declared abandoned pursuant to W.Va.Code, 36–4–9a (1979), and that title be quieted in them. Following a one-day bench trial, the trial court ruled that because the Curreys had received free gas from the well, oil and gas was still being "produced in paying quantities"; thus, the lease had not expired.

W.Va.Code, 36–4–9a, provides, in pertinent part:

> "There shall be a rebuttable legal presumption that the failure of a person, firm, corporation, partnership or association *to produce and sell or produce and use for its own purpose for a period of greater than twenty-four months*, subsequent to the first day of July, one thousand nine hundred seventy-nine, oil and/or gas produced from such leased

1. The remaining appellees are individuals and corporations who have been assigned a share of the working interest in the lease.

2. A "rabbit" or "pig" is a "scraping device for cleaning and testing petroleum and natural gas pipelines." 8 H. Williams & C. Meyers, *Oil and Gas Law* 717 (11th ed. 1987).

3. A "shut-in well" is a "producing well that has been closed down temporarily for repairs, cleaning out, building up pressure, lack of a market, etc." 8 H. Williams & C. Meyers, *supra* at 909.

4. The pertinent lease provision provided:

> "LESSEE shall be obligated to pay or tender to LESSOR within sixty (60) days after any such well is shut in and each anniversary thereafter, as royalty, an amount equal to $300 per year it being the intention of the parties that this lease shall remain in full force and effect for sixty (60) days after shutting in any well without payment."

premises constitutes an intention to abandon any oil and/or gas well and oil and/or gas well equipment situate on said leased premises[.]" (Emphasis added).[5]

The Curreys argue that because more than two years have elapsed since oil and gas operations were conducted or oil and gas was produced in paying quantities, there is a rebuttable presumption that the lease has been abandoned, and TNG failed to overcome this presumption. TNG counters that the free gas was a benefit to the Curreys and constitutes production under the terms of the lease.

We addressed this issue in *Goodwin v. Wright*, 163 W.Va. 264, 255 S.E.2d 924 (1979). In *Goodwin*, the lease was for ten years "and as long thereafter as oil and gas, or either of them, is produced from the said lands by the said LESSEE, its successors and assigns." The lease also contained a free gas provision. Once the lease was in the secondary term and no oil and gas had been produced for over three years, the Goodwins filed suit to void the contract. As in this case, the lessee contended that the Goodwin's receipt of free gas constituted "production" that extended the secondary term of the lease.

We rejected the argument and quoted with approval the following language from *Metz v. Doss*, 114 Ill.App.2d 195, 198, 252 N.E.2d 410, 412 (1969):

"'The purpose of an oil and gas lease is to obtain production. Unless lessee obtains production he cannot recover his drilling expense. Lessor depends upon production for receipt of the royalty provided in the lease. This purpose can only be accomplished if the production which can keep the lease effective for an indefinite future period is production in the ordinary sense of the term and hence results in royalties to the lessor.

"'From a reading of the entire instrument it is evident that the royalty provision is a primary matter, while the free gas, like the provision for burying lines below plow depth, is a secondary matter.'" 163 W.Va. at 268–69, 255 S.E.2d at 927.

Accordingly, we held in Syllabus Point 2 of *Goodwin*:

"When a well is not producing in paying quantities and no royalties or rentals are being received by the lessors, these being required by the terms of a lease as necessary to its continuation, receipt by lessors of free gas for domestic purposes from the well does not constitute consideration sufficient to keep lessors bound by the lease, nor does it amount to 'production.'"[6]

TNG argues that *Goodwin* is not applicable to the facts presented here. Unlike the lessors in *Goodwin*, the Curreys sold oil from the well to Main Star and directed the working-interest share be paid to the lessee. Moreover, the Curreys accepted only their one-eighth royalty. Even if we were to assume that this activity is sufficient enough to constitute "produc[tion] in paying quantities," the sale of oil by Mr. Currey occurred more than twenty-four months before the institution of this suit.[7]

---

5. The statute further provides for several exceptions to the rebuttable presumption:

"This rebuttable presumption shall not be created in instances (i) of leases for gas storage purposes, or (ii) where any shut-in royalty, flat rate well rental, delay rental, or other similar payment designed to keep an oil and gas lease in effect or to extend its term has been paid or tendered, or (iii) where the failure to produce and sell is the direct result of the interference or action of the owner of such oil and/or gas or his subsequent lessee or assignee. Additionally, no such presumption shall be created when a delay in excess of twenty-four months occurs because of any inability to sell any oil and/or gas produced or because of any inability to deliver or otherwise tender such oil and/or gas produced to any person, firm, corporation, partnership or association."

None of these exceptions are applicable to the case at bar.

6. This holding is in accord with the plain language of W.Va.Code, 36–4–9a, which creates a rebuttable presumption of abandonment whenever a "person, firm, corporation, partnership or association [fails] to produce and sell or produce and use *for its own purpose* ... oil and/or gas produced from said leased premises[.]" (Emphasis added).

7. The record is also devoid of any evidence that operations for oil and gas had been conducted

Thus, the statutory presumption, which TNG failed to rebut, still applies.[8]

Accordingly, we reverse the judgment of the Circuit Court of Ritchie County and remand this case with directions to enter judgment for the appellants.

Reversed and remanded with Directions.

___

within two years before this action was filed. In most instances, the term "operation" as used in an oil and gas lease refers "to activity leading to the production of oil and gas[.]" 8 H. Williams & C. Meyers, *supra* at 662. The last time an employee of the leasee visited the well site was in February of 1987, and by shutting the well in, he clearly intended to cease operations and not conduct them.

**8.** Nor do we find applicable the case relied on by the trial court, *Buckles v. Wil-Mc Oil Corp.,* 585 P.2d 1360 (Okla.1978). In *Buckles,* there were several leases which were to remain in force for two years "and as long thereafter as oil

or gas, or either of them, is produced from said lands *by the lessee.*" (Emphasis in original). At the expiration of the primary term, Wil-Mc Oil Corporation assigned its interests to a third party. Mr. Buckles contended that because the lease required production by the lessee, operations by a third-party would not extend the terms of the lease. The Oklahoma Supreme Court rejected this argument because the lease contained a provision allowing the original lessee to assign its interest to third parties.